**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RYAN MCHUGH,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 25-CV-5799** |
| | : | |
| **PENNSYLVANIA DEPARTMENT** | : | |
| **OF CORRECTIONS, *et al.*,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**BEETLESTONE,  C.J.**                                                                        **JUNE 26, 2026**

*Pro se* Plaintiff Ryan McHugh, who is incarcerated at SCI Phoenix ("SCIP"), commenced this civil action by filing a Complaint pursuant to 42 U.S.C. § 1983, naming as Defendants the Pennsylvania Department of Corrections ("DOC"), SCIP Superintendent Joseph Terra, SCIP Deputy Superintendent Mandy Sipple, SCIP Medical Administrator Huner, and SCIP Medical Infection Control Nurse O'Neill[1] (collectively "the Commonwealth Defendants"), Wellpath Health Care Services ("Wellpath"), and Wellpath Medical Director Dr. Letizio (collectively "the Wellpath Defendants").  Currently before the Court are motions to dismiss McHugh's Complaint.  For the following reasons, the Court will dismiss certain claims with prejudice and other claims without prejudice.

---

[1] In their Motion, Defendants clarified the correct spelling for Defendant "Oniel" is "O'Neill."  (ECF No. 15.)  The Court will direct the Clerk of Court to update the docket to accurately reflect her name.  Although McHugh identifies Defendants Huner and O'Neill as employees of Wellpath, the Commonwealth has indicated that they are Commonwealth employees.  (*See id*.)

I.    **FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY**[2]

In 2018, McHugh was transferred to SCI Camp Hill, the DOC's classification and diagnostic center, where he underwent an extensive intake medical exam and a screening process.  (Compl. ¶ 12.)  He was instructed by the health care provider and medical director that he was medically clear and all "lab lines were cleared."  (*Id*.)  In the same year, he was returned to the state prison system from a court hearing in Berks County for his criminal case and was examined by the medical provider a second time and was told once again that he "was medically cleared according to their policies."  (*Id*. ¶ 13.)  Later in 2018, he was transferred to SCIP as his permanent housing assignment.  (*Id*. ¶ 14.)  Upon arrival at SCIP, McHugh underwent a mandatory secondary screening process identical to the testing at SCI Camp Hill, the SCIP medical department told him his lab results were clear, and the site medical director released him into general population.  (*Id*. ¶ 15.)  Throughout his confinement at SCIP, he was seen once a year for mandatory chronic care appointments as required by DOC policy.  (*Id*. ¶ 16.)  McHugh states that the main goal of these screenings is the identification and immediate treatment of serious illnesses, including Hepatitis C virus ("HCV").  (*Id*. ¶ 17.)  The stated goal of Hepatitis C anti-viral treatment is to achieve a Sustained Virological Response, defined as undetectable HCV in the blood 12 or more weeks after completing treatment.  (*Id*. ¶ 18.)  According to McHugh, all new intakes are to be screened utilizing an HCV antibody test and he has never refused any medical testing during his incarceration.  (*Id*. ¶ 19.)

In 2025, during a Wellpath telehealth medical call, an unnamed non-defendant doctor

---

[2] The facts set forth in this Memorandum are taken from McHugh's Complaint ("Compl."). (ECF No. 6).  The Court adopts the pagination assigned to all filings by the CM/ECF docketing system.  Grammar, spelling, capitalization and punctuation errors are cleaned up where necessary.

noticed serious historic abnormalities with McHugh's lab work.  (*Id*. ¶ 20.)  The doctor expressed confusion because the chronic condition had seemingly been documented and known by the DOC since his initial 2018 screenings, yet McHugh was completely unaware of it.  (*Id*.) He was placed on a medical call-out for a multi-level lab report to rule out diagnostic mistakes. (*Id*. ¶ 21.)  When the results were received and were reviewed by the Medical Director, McHugh was informed he "had a severe case of Hepatitis since the very first screening and that the medical department must have overlooked this medical issue."  (*Id*.)

Under established protocols, the Infection Control Nurse ("ICN") must review positive antibody results with the inmate, and the Medical Director must order a confirmatory Hepatitis C RNA quantitative PCR test (viral load).  (*Id*. ¶ 22.)  O'Neill, who is identified elsewhere in the Complaint as the ICN, apologized to McHugh, stating she must have "overlooked the situation at hand, (seven years later)."  (*Id*. at ¶¶ 10, 22.)  Protocols allegedly also dictate that recommended immunizations (Hepatitis A and B), clinical counseling, literature regarding disease transmission, and placement on the annual influenza vaccination list must be provided, but McHugh was never advised of this.  (*Id*. at ¶ 23.)  According to the DOC policy, McHugh should have been notified immediately of his test result, and the Chief of Clinical Services should have rendered a treatment determination when McHugh was first screened and forwarded it to the site Medical Director and ICN to coordinate anti-viral medication and document the encounter in progress notes, which never occurred.  (*Id*. ¶ 24.)  McHugh asserts that he "has been subjected to a variety of layers of medical negligence for seven years" by DOC officials at SCI Camp Hill, SCIP, and by Wellpath, which constitutes cruel and unusual punishment.  (*Id*. ¶ 25.)  As a proximate result of this negligence, he has been left "untreated and [it] has lead [him] sustaining further serious medical complications" that he does not identify.  (*Id*. ¶ 31.)

In Count I of the Complaint McHugh asserts a claim against the DOC for negligence. (*Id*. ¶¶ 27-34.)  In Count II he asserts claims for deliberate indifference to his serious medical needs against Terra and Sipple pursuant to 42 U.S.C. § 1983 because they "adopted policies and practices that govern the delivery and the withholding of the medical services," a policy not to attend to the serious medical needs of inmates, and blame them for "the fact that the facility has medical staffing problems on a daily basis."  (*Id*. ¶¶ 35-40.)  In Count III he asserts deliberate indifference claims against Wellpath, Letizio, Huner, and O'Neill under § 1983 because, despite actual knowledge of McHugh's abnormal lab results and the need for treatment to be started, they knowingly and intentionally failed to take any kind of immediate action that was within the scope of their authority to provide him with medical attention, and maintained policies not to attend to the serious medical needs of inmates.  (*Id*. ¶¶ 35-40.)  McHugh seeks money damages and injunctive relief requiring the Defendants to provide appropriate medical care.  (*Id*. at 10.)

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The same standard applies when the Court is conducting a statutory screening under § 1915(e)(2)(B)(ii).  *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). It is the defendant's burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented"). In screening a claim or resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (noting that *pro se* filings are construed liberally).

## III.    THE DEFENDANTS' MOTIONS

The Commonwealth Defendants argue that all claims for money damages brought against them in their official capacities must be dismissed because, as the official capacity claims are actually claims against the Commonwealth, they are barred by the Eleventh Amendment and because they do not constitute "persons" subject to suit under 42 U.S.C. § 1983. (ECF No. 15 at 7-10.) They argue that the claims against Terra, Sipple, Huner, and O'Neill also fail because

McHugh does not allege they were personally involved in the actions that allegedly caused his injury (*id*. at 10-12) and that McHugh has not stated plausible deliberate indifference claims against them (*id*. at 12-13).  They also argue that McHugh's negligence claim is barred by sovereign immunity (*id*. at 15-16).

In the Motion filed jointly by Wellpath and Dr. Letizio, Wellpath argues that McHugh has not alleged facts to make plausible any deliberate indifference claim against it as a corporate health care provider.  (ECF No. 24 at 9-14.)  Dr. Letizio argues that McHugh has not alleged facts to indicate that he was personally involved in a violation of McHugh's constitutional rights and, because prison health care officials are entitled to a presumption that their care decisions are valid, the deliberate indifference claim is not plausible anyway.  (*Id*. at 14-18.)  Both Defendants add that McHugh's claims must be dismissed because his failure to request monetary relief in a prison grievance means he has failed to exhaust his claim for money damages in this lawsuit.  (*Id*. at 19-21.)  Finally, in Wellpath's separate motion to dismiss (ECF No. 28), it argues that its discharge in bankruptcy included McHugh's claim and, as a released party he may not maintain his claims against Wellpath in this case (*id*. at 8-9).

McHugh has filed two pleadings in response to the pending motions.  In the first, titled a Motion to Dismiss the Defendants' Motion to Dismiss (ECF No. 33), but is actually his Response, McHugh concedes that his official capacity claims against Commonwealth Defendants are barred by the Eleventh Amendment (*id*. at 9, 11).  Responding to the argument that he failed to allege these Defendants' personal involvement, McHugh argues "that he intends to show that the personal involvement will be shown through several allegations of personal direction or of actual knowledge and acquiescence."  (*Id*. at 12.)  He also asserts that he has alleged specific conduct by the Commonwealth Defendants and has plausibly alleged

supervisory liability, and if his allegations are insufficient, he should be permitted leave to amend. (*Id*. at 12-13.)  Addressing the issue of sovereign immunity from negligence claims, McHugh argues that he should be permitted to amend this claim as well since he is "still recovering documents" from eight years ago. (*Id*. at 15.)

McHugh has also moved for leave to file an amended complaint (ECF No. 34), but has not attached a copy of a proposed amended complaint to the motion.  He makes no actual arguments concerning why amendment should be permitted other than to assert that he will add four additional defendants that he does not identify. (*Id*. at 1.)  McHugh has not specifically responded to either of the motions filed by the Wellpath Defendants.

## IV.    DISCUSSION

McHugh asserts claims for violations of his constitutional rights based on his medical treatment.  The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Jutrowski v. Township of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct." (quoting *Iqbal*, 556 U.S. at 677)); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).  "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a

case, the knowledge must be actual, not constructive." *Chavarriaga v. N.J. Dept. of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1194 (3d Cir. 1995)); *see also Rode*, 845 F.2d at 1201 n.6.

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.[3] *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention." *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (cleaned up). "A serious medical need exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering.'" *Dooley*, 957 F.3d at 374 (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

---

[3] Although McHugh makes a passing reference to the Due Process Clause of the Fourteenth Amendment as a source of his claims, (*see* Compl. at 2), as a convicted and sentenced state prisoner, his claims regarding his medical treatment arise under the Eighth Amendment because the Fourteenth Amendment is only implicated in deliberate indifference claims brought by pretrial detainees, *see Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005). Under the "more-specific-provision rule," requiring litigants to pursue constitutional claims under the specific provision that covers the conduct at issue, rather than resorting to the more general Due Process Clause, McHugh must proceed under the Eighth Amendment, *see Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 261 (3d Cir. 2010) ("Betts's claims concern his conditions of confinement and an alleged failure by Defendants to ensure his safety. Because these allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we hold that the more-specific-provision rule forecloses Betts's substantive due process claims." (footnote omitted)). In other words, there is no legal basis for a due process claim here.

Deliberate indifference is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) (citation omitted), *cert. denied*, 2026 WL 1718015 (U.S. June 15, 2026). "[P]rison officials may not 'deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017)); *see also Montanez*, 154 F.4th at 141 ("[The deliberate indifference] standard can also be met by a defendant abandoning a prisoner in a condition that unreasonably exposes him to the threat of tangible residual injury." (internal quotation marks and citation omitted)).

"Not every complaint of inadequate prison medical care rises to the level of deliberate indifference." *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (*per curiam*). "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* at 228 (cleaned up). "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less

efficacious treatment' of the inmate's condition." *Id.* (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Deliberate indifference includes "situations where 'necessary medical treatment is delayed for non-medical reasons.'" *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). It "is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates," or "when prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." *Monmouth Cnty.*, 834 F.2d at 346-47 (cleaned up).

### A.    Commonwealth Defendants

McHugh concedes that claims against the DOC and Commonwealth employees named them in their official capacities and seeking money damages are barred by the Eleventh Amendment. (Response at 9, 11). *See, e.g., Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003). Accordingly, the official capacity claims are dismissed with prejudice.

The individual capacity claims against Terra, Sipple, and Huner are also not plausible. While he names Terra, Sipple, and Huner as Defendants, McHugh does not allege they were personally involved in any act that might have violated his Eighth Amendment rights. *Rode*, 845 F.2d at 1207; *Jutrowski*, 904 F.3d at 290. Indeed, although Huner is a named Defendant, McHugh makes no allegations about her involvement at all. His § 1983 claims against Terra and Sipple assert they were deliberately indifference to his serious medical needs because they are responsible for the overall operation of SCIP (Compl. at 3) and because they "adopted policies and practices that govern the delivery and the withholding of the medical services," a policy not

to attend to the serious medical needs of inmates, and blames them for "the fact that the facility has medical staffing problems on a daily basis in Count II (*id*.at 8-9).

The allegation that Terra and Sipple are in charge of the facility is not a plausible basis for a claim.  Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*).  Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability."  *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).  "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Chavarriaga*, 806 F.3d at 227.

The first type of liability includes a failure to supervise, however, a plaintiff asserting such a claim must identify a supervisory policy or practice that the supervisor failed to employ, and facts that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the

constitutional injury was caused by the failure to implement the supervisory practice or procedure. *Barkes*, 766 F.3d at 317; *see also Chavarriaga*, 806 F.3d at 227. A supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisor prison official. *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that failure to train and supervise claims asserted against supervisor defendants were meritless where the plaintiff failed to make a plausible showing of an underlying constitutional violation). "Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Chavarriaga*, 806 F.3d at 227

McHugh's allegations that Terra and Sipple were deliberately indifference to his serious medical needs because they "adopted policies and practices that govern the delivery and the withholding of the medical services," as well as a policy not to attend to the serious medical needs of inmates, and that they are to blame for "the fact that the facility has medical staffing problems on a daily basis" as alleged in Count II (Compl. at 8), fails to meet this standard. He does not describe the alleged policy in any detail, allege how this policy created an unreasonable risk of a constitutional violation, that Terra and Sipple were aware that said policy created an unreasonable risk but that they were indifferent to that risk, nor does he not allege how his alleged constitutional injury was caused by the failure to implement the supervisory practice. Stated simply, McHugh's parroting of the supervisory liability standard (*see* Compl. at 8), is not sufficient. *See Jankowski v. Lellock*, 649 F. App'x 184, 188 (3d Cir. 2016) (affirming dismissal of failure-to-train supervisory liability claim "relegated to a single sentence in the complaint" as "merely a rote recitation of a cause of action coupled with a legal conclusion" that was

insufficient to satisfy the pleading standard); *see also Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015) (*per curiam*) (affirming dismissal of failure-to-train claim stating, "[n]ot only does [the complaint] not describe the nature of Appellees' training program, it fails to point to specific deficiencies in the program, or explain how those deficiencies caused [plaintiff's] injuries"); *see generally Santiago v. Warminster Township*, 629 F.3d 121, 132 (3d Cir. 2010) (explaining that "mere restatements of the elements of [a plaintiff's] supervisory liability claims . . . are not entitled to the assumption of truth").

The only Commonwealth Defendant against whom McHugh asserts factual allegations is Defendant O'Neill, the ICN at SCIP, who McHugh asserts was required under DOC protocols to review positive antibody results with an inmate, and who apologized to him for having overlooked his testing results.  (Compl. ¶¶ 10, 22.)  While McHugh asserts facts about the protocols requiring certain medical responses, including immunizations, clinical counseling, literature regarding disease transmission, and placement on the annual influenza vaccination list (*id.* ¶ 23), he does not allege that O'Neill personally denied a reasonable request for medical treatment, refused to provide it, delayed him receiving care for non-medical reasons, or prevented him from receiving medical treatment for his HCV condition.  At best, any Eighth Amendment claim against O'Neill is undeveloped since McHugh does not state facts to indicate that she was deliberately indifferent to his serious medical needs.

The Commonwealth Defendants also seek dismissal of all negligence claims.  By statute, Pennsylvania law provides the Commonwealth, its agencies, officials and employees acting in the scope of their duties with sovereign immunity from damages claims.  *See* 1 Pa. Cons. Stat. § 2310 (establishing immunity for Commonwealth officials and employees); 42 Pa. Cons. Stat. § 8521 (limiting waiver of immunity to specific exceptions); *id.* § 8522 (setting forth limited

exceptions); *see also Stackhouse v. Com., Pa. State Police*, 892 A.2d 54, 58 (Pa. Commw. Ct. 2006) ("Generally, the Commonwealth and its agencies, officials and employees acting within the scope of their duties are immune from suits for damages."); *Taalibuddeen v. Walmart, Inc.*, No. 22-1354, 2026 WL 972896, at *10 (M.D. Pa. Apr. 10, 2026) ("[a]s a general matter, subject only to nine specific statutory exceptions, this sovereign immunity bars state law tort claims like those alleged here, since Commonwealth employees are immune from liability for either negligence or intentional torts." (quoting *Colon v. Kenwall*, No. 18-840, 2018 WL 5809863, at *6 (M.D. Pa. Nov. 6, 2018))).  The only codified exception to sovereign immunity possibly applicable here applies to "[a]cts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel." [4]  42 Pa. Stat. and Cons. Stat. § 8522(b)(2).

The United States Court of Appeals for the Third Circuit has stated that sovereign immunity is an affirmative defense and so must be pled and demonstrated by the defendant.  *See e.g.*, *Pa., Dep't of Env't Res. v. U.S. Postal Serv.*, 13 F.3d 62, 63 (3d Cir. 1993) (referring to "the affirmative defense of sovereign immunity").  While it is clear from the face of the Complaint that Terra, Sipple, and Huner are not health care providers against whom a negligence claim can proceed, the application of sovereign immunity to the negligence claim against O'Neill is not so clear.  McHugh specifies that she was the ICN involved, identifying her as a nurse who apologized for having overlooked his testing results.  (Compl. ¶¶ 10, 22.)  Accordingly, the

---

[4] In his Complaint, McHugh specifically references the "real estate exception" to sovereign immunity, 42 Pa. Stat. and Cons. Stat. § 8522(b)(4).  That provision is inapposite to McHugh's medical deliberate indifferent claim since it applies to a dangerous condition deriving from Commonwealth real property.  *See Jones v. Se. Pa. Transp. Auth.*, 772 A.2d 435, 443 (Pa. 2001).  The SCIP prison building itself has nothing to do with McHugh's claim.

Court cannot say that the negligence claim against her is barred on its face by the statute. However, it is not plausible as pled.[5]

Under Pennsylvania law, the elements of a claim for negligence are: (1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) the defendant's failure to conform to the required standard of conduct; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff. *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005); *see also Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) ("when a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions"). Like the Eighth Amendment deliberate indifference claim against O'Neill, McHugh's negligence claim against her is largely undeveloped. He alleges only that she was responsible for testing and scheduling services and acted as a resource in an advisory capacity to others who provide services. (Compl. ¶ 10.) Under the DOC policies, the ICN reviews test results with an inmate on intake and during incarceration, but services are provided by the medical staff. (*Id*. ¶ 22.) While she apologized to McHugh for the failure of others to inform him of his test results (*id*.),

---

[5] The Commonwealth Defendants also assert that no medical claim can proceed because McHugh has failed to comply with the Pennsylvania Rules of Civil Procedure that requires a person asserting a medical malpractice claim to file a "certificate of merit" with respect to each defendant against which he asserts professional malpractice claim. (ECF No. 15 at 17-18.) However, the United States Supreme Court, in a decision handed down the same day that the Commonwealth Defendants filed their Motion, held that these types of state certificate requirements are inconsistent with Rule 8 of the Federal Rules of Civil Procedure, which only requires a short plain statement of a claim. *Berk v. Choy*, No. 24-440, 2026 WL 135974, at *4 (U.S. Jan. 20, 2026) ("Delaware's affidavit requirement is at odds with Rule 8 because it demands more.").

he does not allege that O'Neill herself created an unreasonable risk or that there is any causal connection between this conduct and any resulting injury.

### B.      Wellpath Defendants

McHugh asserts a deliberate indifference claims against Wellpath and Dr. Letizio. Wellpath asserts that McHugh has not alleged facts to make the claim against it as a corporate health care provider plausible.  (ECF No. 24 at 9-14.)  Dr. Letizio argues that McHugh has not alleged facts to indicate that he was personally involved in a violation of McHugh's constitutional rights and, because prison health care officials are entitled to a presumption that their care decisions are valid, the deliberate indifference is not plausible anyway.[6]  (*Id*. at 14-18.) Separately, Wellpath argues that McHugh's claim against it must be dismissed due to the bankruptcy discharge.  McHugh has not addressed these arguments in his Response or Motion.

---

[6] Both Defendants add that McHugh's claims must be dismissed because his failure to request monetary relief in a prison grievance means he has failed to exhaust his claim for money damages in this lawsuit.  (ECF No. 24 at 19-21.)  The PLRA "mandates that prisoners exhaust internal prison grievance procedures before filing suit." *Small v. Camden County*, 728 F.3d 265, 268 (3d Cir. 2013) (citations omitted); *see also* 42 U.S.C. § 1997e(a).  Exhaustion is a non-jurisdictional "standard affirmative defense." *Perttu v. Richards*, 605 U.S. 460, 469 (2025) (citation omitted).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Prater v. Dep't of Corr.*, 76 F.4th 184, 203 (3d Cir. 2023) (courts "determine whether a prisoner has properly exhausted a claim by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances" (internal quotation marks omitted)).  Claims that are not properly exhausted under the PLRA are procedurally defaulted. *See Woodford*, 548 U.S. at 92-93.  "[W]here a defendant moves to dismiss based on a failure-to-exhaust defense and the exhaustion issue turns on indisputably authentic documents related to the inmate's grievances, [a court] may consider those documents without converting a motion to dismiss to a motion for summary judgment." *Rinaldi v. United States*, 904 F.3d 257, 261 n.1 (3d Cir. 2018) (cleaned up) (quoting *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004)).

The Wellpath Defendants appended grievance materials to their motion that they assert indicate that McHugh did not ask for money damages.  (ECF No. 24-3, 24-4.)  However, that material was not attached to McHugh's Complaint and there is nothing to indicate they are indisputably authentic.  Accordingly, the Court will not address exhaustion at this stage of the litigation.

Because the Court retains statutory screening authority in this case under the Prison Litigation Reform Act, 28 U.S.C. § 1915(e)(2),[7] the claims against the Wellpath Defendants will be addressed in that capacity.

McHugh's claims against Dr. Letizio are not plausible. He provides little in the way of facts in the Complaint about Dr. Letizio's personal involvement in the failure to properly advise McHugh of the positive HCV test results or treat him for the condition. For example, McHugh alleges he was transferred to SCIP in 2018 and failed to receive testing results (Compl. ¶ 14), but does not allege that Dr. Letizio was even employed at SCIP at that time. He also does not identify Dr. Letizio as the Wellpath provider who informed him about his test results in the 2025 telemedicine conference (*id*. ¶ 20), and fails to allege that he was ever seen by Dr. Letizio, let alone that Dr. Letizio personally denied a reasonable request for medical treatment, refused to provide it, delayed him receiving care for non-medical reasons, or prevented him from receiving medical treatment for his HCV condition.

The claim against Wellpath will also be dismissed on screening. A private corporation under contract to provide medical services at a jail or prison may be liable under § 1983 in certain circumstances. The United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale*, 318 F.3d at 583 (applying

---

[7] Since McHugh is proceeding *in forma pauperis*, the Court may independently screen his Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). As already mentioned, the standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher*, 184 F.3d at 240.

the municipal-liability framework of *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), to claims against medical contractor)).  To hold a private health care company like Wellpath liable for a constitutional violation under § 1983, a plaintiff must allege Wellpath had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d at 583-84 (citing *Brown*, 520 U.S. at 404); *see also Menkins v. Dep't of Corr.*, No. 24-5258, 2025 WL 2778096, at *4 (E.D. Pa. Sept. 26, 2025) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." (quoting *Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017))).  A plaintiff asserting such a claim "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard.  *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009).  "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries."  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  This can be done "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged.  *Id.* (citation omitted).

While McHugh asserts that DOC policies required testing and follow up procedures for HCV positive inmates, he failed to allege that any policy of Wellpath caused the constitutional violation he alleges.  (*See* Compl. at 9-10, Count III.)  To the extent he alleges that "*defendants* adopted policies and practices that governs the delivery and the withholding of the medical services, including policies and practices that accordingly led to [his] injuries" (*id*. at 8 (emphasis added)), this allegation fails to meet the pleading standard since it does not identify a policy of Wellpath, but instead a policy of the DOC.  Furthermore, where there are multiple events and

defendants at issue, alleging personal involvement often cannot be accomplished by repeatedly and collectively referring to the "Defendants" as a group without clarifying the specific basis for each Defendant's liability.  *See Lawal v. McDonald*, 546 F. App' x 107, 113 (3d Cir. 2014) (agreeing with the district court that the repeated and collective use of the word "Defendants" "fail[ed] to name which specific Defendant engaged in the specific conduct alleged'"); *see also Walker v. Wetzel*, No. 22-1357, 2022 WL 4103632, at *3 (3d Cir. Sept. 8, 2022) (*per curiam*) (affirming district court's conclusion that generalized reference to "medical staff and officers" did not allege personal involvement).

Moreover, the Court can take judicial notice that Wellpath was discharged from liability by the United States Bankruptcy Court for the Southern District of Texas, Houston Division, for claims seeking money damages that arose prior to November 11, 2024.  *See, e.g., In Re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tx.), ECF Nos. 2596 ("The Plan"), 2679, 2680; *see also* 11 U.S.C. § 524(a)(2) ("A discharge in a [Chapter 11 bankruptcy] case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss" the court may consider "matters of which a court may take judicial notice"); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (addressing judicial notice on screening).  Wellpath's approved Plan also includes a "Third-Party Release" relating to claims against current and former employees of Wellpath.  *See* Article IX of the Plan.  This requires plaintiffs holding claims that arose prior to November 11, 2024, to "opt out" of the Third-Party Release if they wish to preserve their claims against Wellpath employees.  *Id*.  Article IX.F of the Plan provides

that holders of claims subject to the Third-Party Release who did not opt out are permanently enjoined from "commencing or continuing any action or proceeding of any kind on account of or in connection with or with respect of" any released claims. *Id*. Under the Plan, any holder of a claim arising prior to November 11, 2024, who is or was an incarcerated individual had until July 30, 2025, to opt-out of the Third-Party Release. The Court has found no indication on the bankruptcy docket that McHugh has opted out of the Third-Party Release.

Accordingly, consistent with the terms of the Plan and the Third-Party Release, any claims against Wellpath and Letizio as its employee for money damages arising before November 11, 2024, are dismissed without prejudice to McHugh pursuing any remedies available to him in the bankruptcy proceedings. The Court expresses no opinion on the availability of such remedies, the validity of the Third-Party Release, or the adequacy of notice and consent, which are issues best directed to the Bankruptcy Court and District Court for the Southern District of Texas. *See, e.g.*, *Jackson v. Smith*, No. 23-0272, 2026 WL 1308870, at *2 (W.D. Pa. Apr. 16, 2026), *report and recommendation adopted sub nom. Jackson v. Wellpath*, 2026 WL 1303028 (W.D. Pa. May 12, 2026); *see also Davis v. St. Amour*, No. 23-00593 2026 WL 820668, at *3 (W.D. Va. Mar. 25, 2026) (citing, *inter alia*, *Patterson v. Mahwah Bergen Retail Grp.*, 636 B.R. 641 (E.D. Va. 2022)); *cf. In re Smallhold, Inc.*, 665 B.R. 704, 717-26 (Bankr. D. Del. 2024) (discussing the consent requirement for third-party releases in the wake of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024)).

## V.    CONCLUSION

For the reasons stated, the following claims are dismissed with prejudice: (1) claims for money damages against the DOC and all Commonwealth employees in their official capacities, and (2) the negligence claims against the DOC and Commonwealth employees, with the

exception of the claim against ICN O'Neill.  The individual capacity Eighth Amendment claims and the negligence claim against ICN O'Neill are dismissed without prejudice and with leave to file an amended complaint.  Any prepetition claims for money damages against the Wellpath Defendants are dismissed without prejudice but with no leave to amend in this case.  McHugh must pursue those claims in the Bankruptcy Court.  Any post-petition claims are also dismissed without prejudice and McHugh may include in an amended complaint any claims against Wellpath and any of its employees that arose after November 11, 2024, or that seek injunctive relief, if he is able to plead more facts to cure the defects identified above regarding policies and personal involvement.  An order follows, which provides more information about amendment.

**BY THE COURT:**


**S/ WENDY BEETLESTONG**
**WENDY BEETLESTONE, C. J.**